306 Ga. 829
FINAL COPY

S18G1149. GEORGIACARRY.ORG, INC. et al. v. ATLANTA
BOTANICAL GARDEN, INC.

BETHEL, Justice.

The Atlanta Botanical Garden, Inc. (the "Garden") leases land from the City of Atlanta where the Garden maintains and nurtures an extensive garden complex. The Garden wishes to enforce a policy precluding the possession of firearms by visitors to, and guests of, the Garden, like Phillip Evans. Evans holds a valid weapons carry license under Georgia law and asserts that he is authorized to carry a firearm at the garden under the authority of OCGA § 16-11-127 (c), which provides that license holders "shall be authorized to carry a weapon . . . in every location in this state not [excluded by] this Code section." The Garden counters that it may enforce its policy based on an exception to the general rule found in the same statutory subsection. Specifically, the Garden claims that it may exclude Evans because it is, in the words of the statute, "in legal

control of private property through a lease" and is thus entitled "to exclude or eject a person who is in possession of a weapon . . . on their private property." Id.

As a preliminary matter, it is worth noting that the resolution of this appeal does not turn on an interpretation or understanding of the Second Amendment to the Constitution of the United States[1] or of Article I, Section I, Paragraph VIII of the Georgia Constitution.[2] Nor does this appeal require us to determine whether the statute runs afoul of other provisions of the United States Constitution or the Georgia Constitution regarding property rights. Rather than requiring an analysis of these constitutional issues, this appeal turns only on the proper interpretation of the above-referenced statute.[3] We granted certiorari to consider whether

---

[1] "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U. S. Const. amend. II.

[2] "The right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe the manner in which arms may be borne." Ga. Const. Art. I, Sec. I, Par. VIII.

[3] In his concurrence, Justice Peterson identifies some circumstances in which serious questions would arise about the constitutionality of OCGA § 16-11-127 (c), as applied to the Garden. To decide this appeal, however, we need not — and therefore do not — address those questions.

OCGA § 16-11-127 (c) permits a private organization that leases property owned by a municipality to prohibit the carrying of firearms on the leased premises. The Court of Appeals determined that it does and affirmed the trial court's grant of summary judgment in favor of the Garden on the petition for declaratory and injunctive relief filed by GeorgiaCarry.Org, Inc. ("GeorgiaCarry") and Evans (collectively, the "Appellants"). See *GeorgiaCarry.Org v. Atlanta Botanical Garden*, 345 Ga. App. 160 (812 SE2d 527) (2018).

Contrary to the rulings below, we determine that for purposes of OCGA § 16-11-127 (c), property may be considered "private" only if the holder of the present estate in the property is a private person or entity. In this case, because the City is a public entity, if it is the holder of the present estate, then the leased premises is not private property within the meaning of the statute because property owned by a municipality is not "private property." If the City thus owns the property, then the Garden has no right to exclude the carrying of firearms on the leased premises because it is not "in legal control of private property through a lease." If, on the other hand, by the

3

terms of the 50-year lease with the City, the Garden holds the present estate in the property, then the property is "private property," the Garden is a "private property owner," and it had the right to exclude Evans from carrying a firearm on the premises. However, because the lease is not in the record on appeal and because this determination requires an examination of its provisions to determine whether it granted an estate to the Garden, summary judgment should not have been granted in favor of the Garden under the theory it asserted in its motion for summary judgment. We therefore reverse the judgment of the Court of Appeals and remand the case for further proceedings.

1. *Background.*

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. OCGA § 9-11-56 (c). Thus, to prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact so that the party is entitled to judgment as a matter of law. A defendant may do this by either presenting evidence negating an essential element of the plaintiff's claims or

4

establishing from the record an absence of evidence to support such claims. . . . Summary judgments enjoy no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of OCGA § 9-11-56 (c) have been met.

(Citations and punctuation omitted.) *Cowart v. Widener*, 287 Ga. 622, 623-624 (1) (a) (697 SE2d 779) (2010).

The underlying facts of this case are largely undisputed. As the Court of Appeals recounted:

The Garden is a private, non-profit corporation that operates a botanical garden complex on property secured through a 50-year lease with the City of Atlanta.[4] Evans holds a Georgia weapons carry license and is a member of GeorgiaCarry, a gun-rights organization. In October 2014, Evans twice visited the Garden, openly carrying a handgun in a holster on his waistband. Although no Garden employee objected to [Evans'] weapon on his first visit, he was stopped by a Garden employee during his second visit and informed that weapons were prohibited on the Garden premises, except by police officers. A security officer eventually detained Evans, and he was escorted from the Garden by an officer with the Atlanta Police Department. Evans and GeorgiaCarry subsequently filed a petition in the Fulton County Superior Court, seeking declaratory and injunctive relief on the basis that OCGA § 16-11-127 (c) authorized Evans — and similarly situated individuals — to carry a weapon

---

[4] While it is uncontested that the Garden and the City entered into a 50-year lease, the remaining terms of the lease are not otherwise presented in the record.

at the Garden. The trial court dismissed the petition after concluding that the issues were not appropriate for the relief sought, a ruling that the Supreme Court reversed in part on appeal. See *GeorgiaCarry.Org v. Atlanta Botanical Garden*, 299 Ga. 26 (785 SE2d 874) (2016). On remand, the trial court held that the Garden's property was considered private under well-established Georgia precedent, allowing the Garden to exclude weapons and, consequently, granted summary judgment to the Garden.[5]

*GeorgiaCarry.Org*, 345 Ga. App. at 161. The Court of Appeals affirmed the trial court's grant of summary judgment in favor of the Garden, and we granted certiorari.

2. *History of OCGA § 16-11-127 (c).*

The current text of OCGA § 16-11-127 (c) was enacted as one of a series of significant revisions to Georgia's weapons possession laws beginning in 2008. Until June 30, 2008, former OCGA § 16-11-127 (a) prohibited individuals from carrying firearms and other

---

[5] The Garden's motion was filed as a motion for judgment on the pleadings. It also filed a response to a motion for summary judgment filed by the Appellants. Because that response included an affidavit and exhibits, the trial court issued an order converting the Garden's motion for judgment on the pleadings to a motion for summary judgment and ruled upon it as such. See OCGA § 9-11-12 (c) ("If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment[.]").

6

prohibited items "at a public gathering." See Ga. L. 2003, p. 423, § 1 (effective June 1, 2003). "Public gatherings" included, but were not limited to, "athletic or sporting events, churches or church functions, political rallies or functions, publicly owned or operated buildings, or establishments at which alcoholic beverages are sold for consumption on the premises." OCGA § 16-11-127 (b) (effective June 1, 2003). The Code section also provided that it did not "otherwise prohibit the carrying of a firearm in any other public place by a person licensed or permitted to carry such firearm[.]" Id.

In 2008, the General Assembly amended this Code section to, among other things, provide that certain government and law enforcement officials were permitted to carry "pistols" in "publicly owned or operated buildings," except that a courthouse security plan could prohibit the carrying of a pistol in a courthouse. Ga. L. 2008, p. 1199, § 4 (effective July 1, 2008). The 2008 law also permitted any "person licensed or permitted to carry a firearm" under state law to carry a firearm, subject to some limitations, "in all parks, historic sites, and recreational areas, including all publicly owned buildings

7

located in such parks, historic sites, and recreational areas and in wildlife management areas . . . and in public transportation[.]" Id. The 2008 law also provided that no person was permitted to carry a firearm into a place prohibited by federal law. Id.

On June 4, 2010, a more sweeping reform to the firearm possession laws, including the provisions of OCGA § 16-11-127, took effect. Except for government buildings, courthouses, jails, prisons, places of worship, state mental health facilities, and areas in and around schools, the new version of OCGA § 16-11-127 (c) permitted "a license holder" and other statutorily authorized persons to carry a weapon "in every location in this state." Ga. L. 2010, p. 963, § 1-3 (effective June 4, 2010). The 2010 law provided that any person who carried a weapon into any of the prohibited locations would be "guilty of carrying a weapon . . . in an unauthorized location" and that such conduct would be "punished as for a misdemeanor[.]" Id. The 2010 law also contained the proviso that "private property owners or persons in legal control of property through a lease, rental agreement, licensing agreement, contract, or any other agreement

8

to control access to such property" had the right to "forbid possession of a weapon or long gun on their property." Id.

On July 1, 2014, this Code section was again amended. Among other changes to the state's weapons possession laws that took effect the same day, the proviso in OCGA § 16-11-127 (c) was amended by the General Assembly to insert the word "private" in three instances where it had not previously been included:

> . . . private property owners or persons in legal control of *private* property through a lease, rental agreement, licensing agreement, contract, or any other agreement to control access to such *private* property shall have the right to exclude or eject a person who is in possession of a weapon or long gun on their *private* property[.]

(Emphasis supplied.) Ga. L. 2014, p. 599, § 1-5 (effective July 1, 2014). This is the current text of OCGA § 16-11-127 (c), and it was in effect at the time the Garden prohibited Evans from carrying a firearm onto the premises the Garden leases from the City of Atlanta.[6]

---

[6] The General Assembly subsequently amended OCGA § 16-11-127 in 2015, but that change did not alter the language of subsection (c). See Ga. L. 2015, p. 805, § 3 (effective July 1, 2015).

The Garden and amici curiae[7] have argued throughout this case that, because the Garden has a private property interest — a leasehold — in the premises it leases from the City of Atlanta, that premises is considered "private property" within the meaning of OCGA § 16-11-127 (c) for the duration of the lease. It was on this basis that the Court of Appeals determined that the Garden had the

_____

In 2016, the Georgia House of Representatives passed a bill (House Bill 1060) that the Garden contends, had it gone into effect, would have specifically barred entities like the Garden from excluding licensed gun holders. The provisions in the House version of House Bill 1060 to which the Garden points us were removed when the Senate Judiciary Committee (and later the full Senate) adopted a substitute version of the bill. Compare House Bill 1060 (As Passed House) (2016) (available at http://www.legis.ga.gov/Legislation/20152016/159239.pdf) with House Bill 1060 (As Passed Senate) (2016) (available at http://www.legis.ga.gov/Legislation/20152016/160743.pdf). The Senate version of House Bill 1060, which was later agreed to by the House of Representatives, was vetoed by Governor Nathan Deal and did not take effect. See Status History of HB 1060 (2015-2016 Regular Session) (available at http://www.legis.ga.gov/Legislation/en-US/display/20152016/HB/1060).

The Garden apparently notes the history of this 2016 legislative proposal to show that the General Assembly, in 2016, did not believe that the version of OCGA § 16-11-127 (c) that took effect in 2014 would bar organizations such as the Garden from excluding the carrying of firearms on property leased from a government entity. But because "failed legislative proposals are a particularly dangerous ground" on which to rest an interpretation of a statute, see *United States v. Craft*, 535 U. S. 274, 287 (122 SCt 1414, 152 LE2d 437) (2002) (citation and punctuation omitted), we lend little credence to this argument.

[7] The Court received briefs in support of the Garden filed on behalf of the Metro Atlanta Chamber, the Development Authority of Fulton County, the Joint Development Authority of Metropolitan Atlanta, Invest Atlanta, and Decide DeKalb.

right to exclude Evans from carrying a firearm on the premises. As discussed below, we reject this interpretation of the statute.

3. *For Purposes of OCGA § 16-11-127 (c), "Property" is Public or Private Depending on the Nature of the Holder of the Present Estate in the Property.*

As we are concerned here with the interpretation of OCGA § 16-11-127 (c), we begin with well established principles of statutory construction. As we have discussed:

> [A] statute draws its meaning from its text. And because we presume that the General Assembly meant what it said and said what it meant when it comes to the meaning of statutes, we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would. Important are the common and customary usages of the words, which, in cases like this one, include the usual and customary meaning of terms as used in a legal context. For context, we may look to other provisions of the same statute, the structure and history of the whole statute, and the other law — constitutional, statutory, and common law alike — that forms the legal background of the statutory provision in question.

(Citations and punctuation omitted.) *Fed. Deposit Ins. Corp. v. Loudermilk*, 305 Ga. 558, 562 (1) (826 SE2d 116) (2019).

The key issue in this case is the meaning of the phrase "private

11

property," as it is used four times in the current version of OCGA § 16-11-127 (c). That Code section provides, in relevant part:

> A license holder[8] . . . shall be authorized to carry a weapon . . . in every location in this state not [excluded by] this Code section; provided, however, that *private property* owners or persons in legal control of *private property* through a lease, rental agreement, licensing agreement, contract, or any other agreement to control access to such *private property* shall have the right to exclude or eject a person who is in possession of a weapon . . . on their *private property* . . . .

(Emphasis supplied.)

The phrase "private property" is not defined in OCGA § 16-11-127 (c), and the Code does not otherwise provide an applicable definition for that phrase. Thus, we must examine the meaning of those words in their broader context, including other legal authorities which may inform our understanding of the phrase's meaning in this statute. *Loudermilk*, 305 Ga. at 562 (1).

Black's Law Dictionary defines "private" to mean "[o]f, relating to, or involving an individual, as opposed to the public or the

---

[8] A "license holder" is "a person who holds a valid weapons carry license." OCGA § 16-11-125.1 (3). Weapons carry licenses are issued pursuant to the standards and procedures set forth in OCGA § 16-11-129.

government." Black's Law Dictionary 1389 (10th ed. 2014). It likewise defines "private property" to mean "[p]roperty — protected from public appropriation — over which the owner has exclusive and absolute rights." Black's Law Dictionary 1412 (10th ed. 2014). To the extent these definitions are helpful, they suggest two principles pertinent to this case. First, in order for a piece of property to be considered "private," the property must be in private ownership. Second, government ownership of the property means that such property is not "private property."

These principles comport with our decision in *Dept. of Transp. v. City of Atlanta*, 255 Ga. 124, 132 (3) (b) (337 SE2d 327) (1985), in which we determined that the term "private property," as used in a statute outlining the Department of Transportation's authority to bring condemnation proceedings, "does not include property owned by a government or a governmental entity," noting that such a reading of the phrase "follows the plain meaning of 'private property.'" We went on to note that "[m]unicipal land . . . is in *all* respects public property." (Emphasis in original.) Id. at 134 (3) (c).

13

Such a reading of the term "private property" is also consistent with a decision of the Court of Appeals in which it determined that the certain property at issue in the case was "public property inasmuch as it [was] owned by [a county housing authority], a public institution." *Vakilzadeh Enterprises v. Housing Auth. of the County of DeKalb*, 271 Ga. App. 130, 131 (608 SE2d 724) (2004).

Moreover, following the 2014 amendment, OCGA § 16-11-127 (c) now draws a clear distinction between "private property" and "public property." In the 2014 amendment, which brought the Code section into its current form, the General Assembly limited the right to exclude the carrying of firearms to only those who own or lease "private property." But, as discussed above, that right was not always thus limited. The version of OCGA § 16-11-127 (c) in effect from June 4, 2010, to June 30, 2014, provided that

> private property owners or persons in legal control of *property* through a lease, rental agreement, licensing agreement, contract, or any other agreement to control access to such *property* shall have the right to forbid possession of a weapon or long gun on their *property*.

(Emphasis supplied.) Ga. L. 2010, p. 963, § 1-3.

14

As the Appellants note and the Court of Appeals acknowledged, with respect to leased property, this language was notably silent as to whether the underlying property being leased was public or private. Thus, a fair reading of the 2010 provision suggests there would have been little need to determine whether the property at issue was public or private as the right to exclude firearms from a leased premises was not dependent on the public or private nature of the property. Accordingly, the Garden's argument that its leasehold interest in the property gives it the right to exclude the possession of firearms on the leased property would be significantly stronger if the version of OCGA § 16-11-127 (c) enacted in 2010 had been in effect at the time the Garden excluded Evans from carrying a firearm on the property. But it was not.

The 2014 amendment to the Code section specified that the right to exclude the carrying of firearms applies only to "private property." To suggest otherwise is to argue that the additional language made no change to the statute's application. Such a reading of course violates a core principle of statutory interpretation

that "changes in statutory language generally indicate an intent to change the meaning of the statute." (Citation and punctuation omitted.) *Jones v. Peach Trader Inc.*, 302 Ga. 504, 514 (III) (807 SE2d 840) (2017). See also *Dept. of Transp.*, 255 Ga. at 132 (3) (b) ("After repeated references to 'property,' or 'any property,' we cannot ignore the legislature's specific use of the adjective 'private' for the first time.").

All parties seem to agree that no reading of OCGA § 16-11-127 (c) permits a determination that the City of Atlanta is a "private property owner" under the statute. In light of the dictionary definitions noted above, other interpretations of the statutory phrase "private property" in our applicable decisional law, and the evolution of the text of OCGA § 16-11-127 (c) leading up to the 2014 amendment, they are undoubtedly correct. Even so, the Garden urges this Court to find that its lease with the City of Atlanta makes the Garden "a person in control of private property through a lease" within the meaning of the statute. But the simple fact that a lease is held by a private entity does not answer the question of whether

16

the property in question is "private property."

We note that in support of its holding below, the Court of Appeals relied principally on this Court's statement in *Delta Air Lines v. Coleman*, 219 Ga. 12, 16 (1) (131 SE2d 768) (1963) that "private property becomes public property when it passes into public ownership; and public property becomes private property when it passes into private ownership." (Punctuation omitted.) *GeorgiaCarry.Org*, 345 Ga. App. at 162. The Court of Appeals also relied upon two later decisions in support of the broad proposition that the public or private nature of property changes based on the public or private nature of an entity that holds a leasehold interest in it. Id. at 162-163 (citing *Columbus Bd. of Tax Assessors v. Med. Center Hosp. Auth.*, 302 Ga. 358 (806 SE2d 525) (2017) and *Douglas County v. Anneewakee, Inc.*, 179 Ga. App. 270 (346 SE2d 368) (1986)).

As this Court discussed in *Coleman*, under the tax code in effect at the time, all public property was exempt from taxation but remained so only so long as it remained in public ownership.

17

*Coleman*, 219 Ga. at 16 (1). This Court stated that once property was sold to a private owner, "the natural implication is that it goes there with the ordinary incidents of private property and therefore is subject to being taxed." Id. This principle was not limited simply to cases in which a parcel of public property was sold in fee to a private owner who would be subject to ad valorem taxes on the property. The tax code in effect at the time also required "the owner of any *estate* in land less than the fee to return it for taxes and pay taxes on it as on other property." (Emphasis supplied.) Id. As "[a] leasehold is an estate in land less than the fee," this Court determined that the tax code provided that such leasehold was "severed from the fee and classified *for tax purposes* as realty." (Emphasis supplied.) Id. Thus, in *Coleman*, we held that "[w]hen the City of Atlanta conveyed . . . a leasehold *estate* in the land . . . [the City] completely disposed of a distinct *estate* in its land for a valuable consideration, and [the private entity] acquired [the distinct estate] and holds it as a *private owner*." (Emphasis supplied.) Id.

Based on *Coleman* and later property tax cases, the Court of

18

Appeals held that "the leasehold interest held by the Garden, when severed from the fee owned by the City of Atlanta, is classified as private property." *GeorgiaCarry.Org*, 345 Ga. App. at 163. The Garden and amici curiae now urge this Court to affirm that ruling and its application of *Coleman*.

The Court of Appeals was undoubtedly correct that the Garden has property rights in the property it leases from the City of Atlanta. Those are private rights because the Garden is a private entity. But that does not answer the question of whether, by virtue of the rights granted by the lease, the Garden has an "estate" in the property. The Court of Appeals appears to have interpreted *Coleman* to mean that any lease between a public landlord and a private tenant renders the leased property "private property" because such lease creates a private estate in the property. But that does not reflect a correct understanding of the legal concepts relating to leases that underlie *Coleman*.

When a landlord and a tenant enter into a lease for a specified period of time, as the Garden and the City did here, that lease may

19

create one of two types of rights in the property in favor of the tenant. If the lease grants to the tenant "the right simply to possess and enjoy the use of" the property, "no estate passes out of the landlord and the tenant has only a usufruct." OCGA § 44-7-1 (a). "A usufruct has been referred to as merely a license in real property, which is defined as authority to do a particular act or series of acts on land of another without possessing any estate or interest therein." (Citation and punctuation omitted.) *Jekyll Dev. Assoc. v. Glynn County Bd. of Tax Assessors*, 240 Ga. App. 273, 274 (1) (523 SE2d 370) (1999).

However, a lease for a fixed period of time may also create an estate for years. "An estate for years is one which is limited in its duration to a period which is fixed or which may be made fixed and certain." OCGA § 44-6-100. "The grant by one person to another of an estate for years out of his own estate, with reversion to himself, is usually termed a lease." OCGA § 44-6-102. "An estate for years carries with it the right to use the property in as absolute a manner as may be done with a greater estate, provided that the property or

the person who is entitled to the remainder or reversion interest is not injured by such use." OCGA § 44-6-103.[9] "[I]t is the policy of the law to treat the tenant of any estate for years as the owner, during the life of such estate." *Evans Theatre Corp. v. DeGive Investment Co.*, 79 Ga. App. 62, 66 (52 SE2d 655) (1949) (citing *James G. Wilson Mfg. Co. v. Chamberlain-Johnson-DuBose Co.*, 140 Ga. 593 (79 SE 465) (1913)). See also *Coleman*, 219 Ga. at 16 (1) (conveyance of leasehold estate "disposed of a distinct estate" in the land which grantee holds "as a private owner"); *Life Chiropractic College v. Carter & Assoc.,* 168 Ga. App. 38, 39 (1) (308 SE2d 4) (1983) (distinguishing between "right of possession" created by usufruct and "proprietary interest" granted by estate for years).

"Because a usufruct is not considered an estate in real property

---

[9] OCGA § 44-6-60 provides:

(a) An estate in remainder is one limited to be enjoyed after another estate is terminated or at a time specified in the future.

(b) An estate in reversion is the residue of an estate, usually the fee left in the grantor and his heirs after the termination of a particular estate which he has granted out of it.

(c) The rights of the reversioner are the same as those of a vested remainderman in fee.

21

under Georgia law," *Clayton County Bd. of Tax Assessors v. Aldeasa Atlanta Joint Venture*, 304 Ga. 15, 16 (1) (815 SE2d 870) (2018), the creation of a usufruct in favor of a tenant does not pass any estate out of the hands of the landlord. Thus, during the term of a usufruct, the landlord continues to hold the present estate in the property. By contrast, if the lease creates an estate for years, the present estate in the property passes from the landlord/grantor to the tenant/grantee for the duration of the lease, and the tenant/grantee is treated by our law as the owner of the property for that period of time. *Evans Theatre Corp.*, 79 Ga. App. at 67.

As *Coleman* and its progeny illustrate, this distinction presents itself most readily in the context of property taxation because estates for years are taxable, and usufructs are not. See *Camp v. Delta Air Lines*, 232 Ga. 37, 39 (205 SE2d 194) (1974) (citing *Coleman* for the proposition that an estate for years is taxable). See also *Macon-Bibb County Bd. of Tax Assessors v. Atlantic Southeast Airlines*, 262 Ga. 119, 119 (414 SE2d 635) (1992) (construing OCGA § 48-5-3 to exclude usufructs from the definition of "taxable

22

property"). *Coleman* itself acknowledges that it was because the lease at issue in that case created an estate — as opposed to a usufruct — that the property interest held by the private entity was taxable. *Coleman*, 219 Ga. at 16-17 (1). But *Coleman* and other tax cases, as well as our modern statutes regarding usufructs and estates for years, illustrate a broader principle — that the grant of an estate transfers ownership of the property to the estate holder during the term of the estate, *Evans Theatre Corp.,* 79 Ga. App. at 67, whereas, the creation of a usufruct does not. The Court of Appeals' analysis and application of *Coleman* and its progeny omits this key distinction.

This leaves the case before us in an interesting posture. The Garden has argued throughout the case that its status as a private entity and its lease with the City make the property at issue "private property" within the meaning of OCGA § 16-11-127 (c). But as we have just discussed, that a lease is held by a private entity does not summarily answer the question of whether the property governed by the lease is "private property." Rather, an examination of the

23

terms of the lease is required in order to determine whether the lease created an estate in the private lessee such that the property has become private property for the term of the lease.

While the Garden's lease with the City may allow the Garden to use and enjoy the leased premises and create for the Garden private property *rights* in the premises, it is not clear whether the provisions of the lease grant an *estate* in the property to the Garden. If the lease does not grant an estate to the Garden, the Garden merely has a usufruct. If that is the case, throughout the term of the Garden's lease with the City, the leased premises has never been anything other than public property because the present estate in the property has always been held by the City of Atlanta, a public entity. See *Dept. of Transp.*, 255 Ga. at 132-133 (3) (b). That a private entity has a lease granting it the right to use and enjoy the public property does not change this essential fact. See OCGA § 44-7-1 (a).

However, it is quite possible that the 50-year lease between the City and the Garden created an estate for years that is presently

24

held by the Garden. Where "the term of a lease is for a period greater than five years, a rebuttable presumption arises that the parties intended to create an estate for years rather than a usufruct." *Eastern Air Lines v. Joint City-County Bd. of Tax Assessors*, 253 Ga. 18, 19 (1) (315 SE2d 890) (1984). See also OCGA § 44-7-1 (b) ("All renting or leasing of real estate for a period of time less than five years shall be held to convey only the right to possess and enjoy such real estate, to pass no estate out of the landlord, and to give only the usufruct unless the contrary is agreed upon by the parties to the contract and is so stated in the contract."). In order to resolve whether the presumption is overcome in a given case, the court "must examine the terms of the lease [agreement] and determine what interests the parties intended to convey." *Eastern Air Lines*, 253 Ga. at 19 (1). The "key inquiry turns upon whether various restrictions in the agreement, limiting [the lessee's] use of the premises, sufficiently negate the presumption that this is an estate for years." *Camp*, 232 Ga. at 40 (finding the use restrictions in a 30-year lease were incompatible with an estate for years and rebutted

25

the presumption that the lease created an estate for years). "An estate for years may be encumbered or somewhat limited without being reduced to a usufruct." *Jekyll Dev.*, 240 Ga. App. at 275 (2). "As in the construction of all agreements, the cardinal rule to be used by the court is that the terms of the instrument itself must be scrutinized to ascertain what interest the parties intended to be conveyed or demised by it." *Allright Parking of Ga., Inc. v. Joint City-County Bd. of Tax Assessors*, 244 Ga. 378, 385 (3) (260 SE2d 315) (1979).

If the lease in fact granted an estate for years to the Garden, the Garden holds the present estate in the property for the duration of the lease—in other words, Georgia law considers the Garden to be the owner of the property during the term of the lease. If that is the case, because the Garden is a private entity, the property is "private" so long as the Garden holds the estate. *Coleman*, 219 Ga. at 16 (1). The Garden would thus be considered a "private property owner" within the meaning of OCGA § 16-11-127 (c).

Employing the distinction between usufructs and estates in

26

land that *Coleman* and our modern property statutes recognize gives full effect to each of the provisions of OCGA § 16-11-127 (c) at issue here. This is critical because courts should "avoid a construction that makes some language mere surplusage." (Citation and punctuation omitted.) *Lucas v. Beckman Coulter, Inc.*, 303 Ga. 261, 263 (811 SE2d 369) (2018). By distinguishing between owners and lessees of private property, OCGA § 16-11-127 (c) vests rights to exclude the carrying of firearms in separate classes of persons and entities. The interpretation of the term "private property" we have outlined above means that any private entity that holds the present estate in land (whether in fee or a lesser estate such as an estate in years) is a "private property owner" within the meaning of the statute for the duration of that estate, and the land it owns is "private property" by virtue of that estate. Under OCGA § 16-11-127 (c), such a person can exclude the carrying of firearms on their property.

However, if one private person leases property from another private person and that lease creates only a usufruct, the tenant is not a "private property owner." But that person may be "in legal

27

control of private property through a lease." If so, such tenant would only be permitted to exclude the carrying of firearms on the property if it could show that the property was "private property" due to the private nature of the landlord (not the tenant) and that the tenant was in "legal control" of such property through its lease.[10] In such a case, the tenant would have the right under the statute to exclude the carrying of firearms on the leased premises. Thus, proper application of *Coleman* and our statutes regarding usufructs and estates for years avoids the redundancy inherent in the interpretation of OCGA § 16-11-127 (c) adopted by the Court of Appeals and gives distinct effect to each of the provisions of the statute granting rights to owners and lessees of private property. See *Berryhill v. Ga. Community Support and Solutions*, 281 Ga. 439, 441 (638 SE2d 278) (2006) ("Courts should give a sensible and

---

[10] As with many terms in OCGA § 16-11-127 (c), the phrase "legal control of private property through a lease, rental agreement, licensing agreement, contract, or any other agreement to control access to such private property" is not defined. However, we need not construe the meaning of this phrase in this case in light of our determination that the property cannot be considered "private property" if the Garden holds a mere usufruct in it.

intelligent effect to every part of a statute and not render any language superfluous.").

4. *Conclusion*.

Based on the foregoing, we determine that for purposes of OCGA § 16-11-127 (c), property may only be considered "private" if the holder of the present estate in the property is a private person or entity. In this case, because the City is a public entity, if it is the holder of the present estate in the land it leases to the Garden, the leased premises is not "private property" within the meaning of the statute, and the Garden has no right to exclude the carrying of firearms on the leased premises because it is not "in legal control of private property through a lease." By contrast, if by the terms of the 50-year lease, the Garden holds the present estate in the property, the property is "private property," the Garden is a "private property owner," and it had the right to forbid Evans from carrying a firearm on the premises pursuant to OCGA § 16-11-127 (c). This reading of the statute gives full effect to the 2014 amendment to OCGA § 16-11-127 (c), the distinction the statute draws between "private

29

property owners" and "persons in legal control of private property through a lease," and our existing statutory and case law setting forth the conditions under which a lease is deemed to create an estate in the lessee such that it is the "owner" of the property during the term of the lease.

However, because the lease between the Garden and the City is not in the record and because this question turns on its interpretation, summary judgment in favor of the Garden should not have been granted because the Garden is not entitled to judgment as a matter of law at this point in the proceedings. See OCGA § 9-11-56 (c). Rather, in order to determine the proper application of OCGA § 16-11-127 (c) to this or any lease of land by a private entity from a governmental entity, the court must determine whether the specific lease in question creates an estate for years or a usufruct. That has not been done in this case and cannot be done on the record before us. We therefore reverse the decision of the Court of Appeals affirming the trial court's grant of summary judgment in favor of the

Garden and remand the case for further proceedings.[11]

*Judgment reversed and case remanded. All the Justices concur, except Melton, C. J., not participating, and Ellington, J., disqualified.*

---

[11] In their briefs before this Court, the Garden and its supporting amici curiae outline a number of economic, fiscal, social, and public safety concerns they contend will result from a decision by this Court in favor of the Appellants in this case. Whatever merit those arguments may have, those arguments are policy arguments, not legal ones.

> [S]triking the right balance between competing legitimate policy interests is a political question, and this Court is concerned only with legal questions. As members of this State's judicial branch, it is our duty to interpret the laws as they are written. We leave political questions to the political branches, and the policy arguments in this case are properly directed to the General Assembly.

(Citations and punctuation omitted.) *Deal v. Coleman*, 294 Ga. 170, 174 (1) (a) n.11 (751 SE2d 337) (2013).

S18G1149. GEORGIACARRY.ORG., INC. et al. v. ATLANTA BOTANICAL GARDEN, INC.

PETERSON, Justice, concurring.

There is no responsibility of government more fundamental than the protection of private property; as the Georgia Constitution puts it, "[p]rotection to person and property is the paramount duty of government. . . ." Ga. Const. of 1983, Art. I, Sec. I, Par. II. This principle has been crystal clear since well before the founding of our Republic. See, e.g., 1 William Blackstone, Commentaries on the Laws of England 135 (1765) ("So great moreover is the regard of the law for private property, that it will not authorize the least violation of it; no, not even for the general good of the whole community . . . . [T]he law of the land has postponed even public necessity to the sacred and inviolable rights of private property."); 2 Joseph Story, Commentaries on the Constitution of the United States § 1790 (Thomas M. Cooley ed., 4th ed. 1873) ("One of the fundamental objects of every good government must be the due administration of

justice; and how vain it would be to speak of such an administration, when all property is subject to the will or caprice of the legislature and the rulers."); *Lynch v. Household Fin. Corp.*, 405 U. S. 538, 552 (92 SCt 1113, 31 LE2d 424) (1972) ("That rights in property are basic civil rights has long been recognized." (citing John Locke, John Adams, and William Blackstone)).

Our constitutional system of limited government and individual rights depends upon the consistent government protection of private property. As the high court of one of our sister states recently observed, "a government's failure to protect private property rights puts every other civil right in doubt." *AGCS Marine Ins. Co. v. Arlington County*, 800 SE2d 159, 163 (II) (A) (1) (Va. 2017) (citation and punctuation omitted). We made a similar point over a half-century ago: "Private property is the antithesis of Socialism or Communism. Indeed, it is an insuperable barrier to the establishment of either collective system of government." *State Hwy. Dept. v. Branch*, 222 Ga. 770, 772 (152 SE2d 372) (1966).

But today we have decided that, although lessees who hold an

estate for years are properly classified under OCGA § 16-11-127 (c) as "private property owners" and thus may still exclude persons carrying firearms, private lessees of public property who hold only a usufruct may no longer choose to exclude persons carrying firearms from their property. For at least most of those whose leases were executed before the effective date of the 2014 amendment that we consider today, that amendment retroactively destroyed the property right such lessees had to exclude people carrying firearms.

This may be at odds with the Georgia Constitution, which contains a wide range of complementary protections for private property rights. Here are a few of the more explicit protections: Ga. Const. of 1983, Art. I, Sec. I, Par. I ("No person shall be deprived of life, liberty, or property except by due process of law."); Art. I, Sec. I, Par. II ("Protection to person and property is the paramount duty of government and shall be impartial and complete. No person shall be denied the equal protection of the laws."); Art. I, Sec. I, Par. X ("No bill of attainder, ex post facto law, retroactive law, or laws impairing the obligation of contract or making irrevocable grant of special

privileges or immunities shall be passed."); Art. I, Sec. III, Par. I (a)

("private property shall not be taken or damaged for public purposes

without just and adequate compensation being first paid").[12]

Today, we interpret the 2014 amendment's prohibition on

excluding persons carrying firearms as applying to private parties

whose lease of public property has conferred on them only a

usufruct. This application may run afoul of several of the provisions

I identify above (and perhaps some that I have not), but I will focus

on what seems to me the most obvious problem — the Constitution's

prohibition on retroactive laws found in Article I, Section I,

Paragraph X.

"Even when the General Assembly clearly provides that a law

is to be applied retroactively, our Constitution forbids statutes that

---

[12] Some of these provisions have federal corollaries. Although we may well interpret many of our provisions consistent with the parallel federal provisions, I have previously observed that the text and history of our Takings Clause suggest that it perhaps should not be. See *Diversified Holdings v. City of Suwanee*, 302 Ga. 597, 615 (807 SE2d 876) (2017) (Peterson, J., concurring); see also Maureen E. Brady, The Damagings Clauses, 104 Va. L. Rev. 341 (2018) (arguing that state constitution takings clauses that prohibit "damaging" or "injuring" property for public use without just compensation should be interpreted more broadly than the federal Takings Clause).

apply retroactively so as to injuriously affect the vested rights of citizens." *Deal v. Coleman*, 294 Ga. 170, 175 (2) (751 SE2d 337) (2013) (citation and punctuation omitted). Such a statute "takes away or impairs vested rights acquired under existing laws or creates a new obligation, imposes a new duty, or attaches a new liability in respect to transactions or considerations already past." *Southern States-Bartow County, Inc. v. Riverwood Farm Homeowners Assn.*, 300 Ga. 609, 612 (797 SE2d 468) (2017) (citation and punctuation omitted). "[T]his principle does not apply with respect to public rights, which are shared by the People in common, and which can be modified by the People — through their elected representatives — as they see fit." *Deal*, 294 Ga. at 179 (2) (a). Nor does it apply to a "mere minimal condition" on a vested right, such as a retroactive impairment that could be avoided by the payment of a tax. See *Southern States*, 300 Ga. at 612-613.

But the amendment destroys a portion of the right to exclude others from one's property, "one of the most essential sticks in the bundle of rights that are commonly characterized as property."

*Dolan v. City of Tigard*, 512 U. S. 374, 393 (III) (B) (114 SCt 2309, 129 LE2d 304) (1994) (citation and punctuation omitted); see also *Rabun County v. Mountain Creek Estates, LLC*, 280 Ga. 855, 856-857 (1) (632 SE2d 140) (2006) ("The term property comprehends not only the thing possessed, but also, in strict legal parlance, means the rights of the owner in relation to land or a thing; the right of a person to possess, use, enjoy and dispose of it, and the corresponding right to exclude others from the use." (citation and punctuation omitted)). "Indeed, it is difficult to conceive of any property as private if the right to exclude is rejected." Richard A. Epstein, Takings, Exclusivity and Speech: The Legacy of *PruneYard v. Robins*, 64 U. Chi. L. Rev. 21, 22 (1997). Before the amendment, Georgia law respected that right to exclude by providing that "private property owners or persons in legal control of property through a lease, rental agreement, licensing agreement, contract, or any other agreement to control access to such property" had the right to "forbid possession of a weapon or long gun on their property." OCGA § 16-11-127 (c) (2010). The amendment constricted that right to exclude in a

significant way.

The property rights conferred by a lease are not merely a public right available to all, but the sort of private, vested rights that the government may not retroactively impair. See *Appalachee Enterprises v. Walker*, 266 Ga. 35, 37 (2) (463 SE2d 896) (1995) (statutory provision for extension of land-use covenants unconstitutionally retroactive as applied to developer who purchased lots prior to statutory change); *Todd v. Morgan*, 215 Ga. 220, 221-222 (2) (109 SE2d 803) (1959) (statutory change in conditions under which title to land used to secure debt would revert to grantor violated federal and state constitutional provisions against passage of retroactive laws or laws that impair the obligations of contracts).

And the intrusion that may be authorized by the amendment cannot be said to be a "mere minimal condition." Even though the amendment would not preclude anyone from using their property altogether, the right to exclude other persons, as noted above, is an essential element of property rights. And there is nothing a property

owner or lessor can do to avoid the implications of the amendment. Compare *Southern States*, 300 Ga. at 612-613 (statute that "eliminate[s]" right for non-conforming use if land is not actually used for non-conforming purpose within one year is unconstitutionally retrospective in application); with *Hayes v. Howell*, 251 Ga. 580, 583-584 (2) (b) (308 SE2d 170) (1983) (statute that does not divest mineral owner of his rights, but merely conditions their retention by allowing landowner to prevent acquisition via adverse possession by paying taxes on the rights, is constitutional).[13]

All of this said, the nature of usufructs has a strange consequence for the constitutionality of the amendment. The amendment was likely unconstitutional in nearly all of its applications the moment that it became effective, because all of the lessees to which it applied had entered into their leases before the

---

[13] I do not doubt the General Assembly's authority to prescribe prospectively the terms under which state and local governments may lease their property. But the amendment did not merely affect leases executed following its effective date.

effective date. But the amendment has become more constitutional as time has gone by, as leases that conveyed a usufruct expire and are renewed or the property is leased to someone else after the amendment's effective date (which, of course, doesn't raise a retroactivity problem). The amendment became effective about five years ago. Leases for a term less than five years presumptively confer a usufruct; leases for a term longer than five years presumptively confer an estate for years. See OCGA § 44-7-1. Of course, longer-term leases can confer only a usufruct if the parties so agree, and certainly such leases still exist. But there are far fewer leases creating a usufruct that predate the amendment today than there were when the amendment was enacted.

Then-Chief Judge Dillard identified similar constitutional problems below, arguing that the canon of constitutional avoidance offered an additional reason to adopt the construction the Court of Appeals placed on the amendment. See *GeorgiaCarry.Org v. Atlanta Botanical Garden*, 345 Ga. App. 160, 166-167 (812 SE2d 527) (2018) (Dillard, C. J., concurring fully and specially). Although obviously I,

too, have constitutional concerns, the avoidance canon empowers a court to choose only "between competing plausible interpretations of a statutory text." *Nordahl v. State*, 306 Ga. 15, 20 (1) (829 SE2d 99) (2019). I join the Court's opinion in full because I have not been able to identify a competing interpretation that I find sufficiently plausible to invoke the canon.

I recognize that the General Assembly enacted the amendment in furtherance of the right to keep and bear arms. This is a right that has been jealously guarded in this state. See, e.g., *Nunn v. State*, 1 Ga. 243, 251 (1846). But each of the branches of state government must protect that right without jeopardizing other equally fundamental rights. It should not go without noting that the consequence of our decision today is that the amendment likely was unconstitutional in almost all of its applications when it first became effective, and probably in some that still remain.

DECIDED OCTOBER 7, 2019.

Certiorari to the Court of Appeals of Georgia — 345 Ga. App. 160.

*John R. Monroe*, for appellants.

*Alston & Bird, David B. Carpenter, James C. Grant*, for appellee.

*Jones Day, Peter C. Canfield, Brian C. Lea; Arnall Golden Gregory, Henry R. Chalmers, Andrew C. Stevens*, amici curiae.