**THIRD DIVISION**
**DOYLE, P. J.,**
**GOBEIL, J., and SENIOR JUDGE FULLER**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 27, 2023**

# In the Court of Appeals of Georgia

A23A0795. MORGAN COUNTY HOSPITAL AUTHORITY v. CITY OF MADISON.

DOYLE, Presiding Judge.

Morgan County Hospital Authority ("MCHA") filed a declaratory judgment action against the City of Madison ("the City") regarding certain property MCHA owned and operated as an acute care hospital ("1077 Main Street"). MCHA intended to sell the property to a buyer to operate an acute drug and alcohol treatment facility ("treatment facility"), which the City refused to allow without the buyer obtaining a conditional use permit ("CUP"). Following the trial court's entry of judgment in favor of the City, MCHA appeals,[1] arguing that the trial court erred (1) by applying a City zoning ordinance to MCHA, which is immune from zoning as a government entity;

---

[1] MCHA filed an application for discretionary review, which this Court granted on December 1, 2022.

(2) by finding that MCHA had abandoned use of 1077 Main Street such that the property could not be sold, leased, or operated as a treatment facility by a buyer without obtaining a CUP; and (3) by finding that MCHA could not itself reopen 1077 Main Street as a treatment facility without obtaining a CUP. For the reasons that follow, we affirm in part and reverse in part.

The record shows that MCHA was established by the Morgan County Board of Commissioners in 1957 and operated an acute care hospital at 1077 Main Street in the City beginning in approximately 1960. During operation at 1077 Main Street, in addition to all other hospital services that came and went over the years, MCHA treated the acute needs of individuals experiencing drug and alcohol addiction. During its history, MCHA contracted with at least one private company to provide those services at 1077 Main Street.

The facilities at 1077 Main Street became obsolete for many medical purposes, and around 2015, MCHA began construction of a new facility at a different location, relocating most of the hospital operations to that new facility by December 2018. MCHA obtained authorization from the State of Georgia to transfer its certificate of need ("CON") and all of its various licenses and permits to the new location. Nevertheless, MCHA still used the 1077 Main Street location for some services,

including hospital equipment storage, x-rays, rental of one building to an orthopedic clinic, hospital billing, physician credentialing, vaccine administration, preparation as a potential treatment overflow location during the COVID-19 pandemic, and emergency and law enforcement training (outlaying approximately $120,000 per year to maintain the facilities to be ready for service within only a few days of request to be back online).

In mid-2018 prior to moving most hospital operations, MCHA engaged a broker to sell 1077 Main Street and conducted a market study, which indicated the highest and best use of the site would be as a treatment facility consisting of an acute detoxification center for individuals with substance use disorder, including doctors and nurses caring for those patients during their time at the facility. In order to facilitate the sale, MCHA reached out to the City for assurance that the treatment facility could use the property without violating any zoning provisions. Previously, in July 2018, the City had provided a letter to MCHA stating that "[p]er the Zoning Ordinance, [1077 Main Street] is in the Professional/Office/Institutional District (P1) and Corridor Design Overlay District (CDO). . . . Per the Zoning Ordinance, the current use of the property as a *hospital* is a permitted use."[2]

---

[2] (Emphasis in original.)

In March 2019, however, the City amended its zoning ordinances to provide that

> if any such [nonconforming] use is abandoned, regardless of intent to resume use by the one having the right to use the property, no non[]conforming use may be resumed. It shall be prima facie evidence of abandonment for the owner and/or one having the right to use the property to (a) discontinue the non[]conforming use for more than twelve (12) months; (b) fail to obtain a new or renew an existing business license and remit the business occupation tax required by the Code of Ordinances for the non[]conforming use; or (c) fail to declare and remit the sales tax required by state law for the non[]conforming use.[3]

The City also changed hospitals from permitted uses to conditional uses in P-1 zones, which necessitated buyers to obtain a CUP.[4] The process for issuing a CUP included an application, public hearings, and an ultimate decision made by the City council based on a list of ten subjective criteria.[5]

Thereafter, in April 2019, the City sent a new letter to MCHA stating

---

[3] Official Zoning Ordinance of the City of Madison, Georgia § 500.4 (2019).

[4] See Official Zoning Ordinance of the City of Madison, Georgia § 620.3 Table 7 (2019).

[5] See Official Zoning Ordinance of the City of Madison, Georgia § 1125 (2019).

(i) The Project is zoned P-1 under the laws or ordinances of the City of Madison, Georgia, which zoning is proper for the Project and related amenities comprising the Project. Based on a recent amendment to our zoning ordinance, any change in the use of the Project will now require a [CUP];

(ii) You have requested an interpretation of the zoning ordinance in the event that the Project is sold to an entity which utilizes the Project for a drug and alcohol rehabilitation facility. *Based on the City of Madison's usual method of interpreting its Zoning Ordinance, the City of Madison takes the position that a drug and alcohol rehabilitation facility is a use which is included under the term 'Hospital' as the same is used and defined in its Zoning Ordinance.*[6]

While that use is included under the term 'Hospital,' it is a conditional use. For that reason, it will be necessary to apply for and receive a [CUP] before utilizing the Project as a drug and alcohol rehabilitation facility.

MCHA received at least two contracts and several letters of intent, none of which were finalized because they could not get a zoning authorization letter from the City in order to facilitate closing. MCHA did not apply for a CUP because it did not believe that it was legally required to do so, and it would be fruitless in any event.

---

[6] (Emphasis supplied.)

Because of the impasse reached with the City, MCHA filed this declaratory judgment action, seeking a ruling: (1) that the City's definition of hospital includes use of the premises on 1077 Main Street for a treatment facility; (2) that MCHA has not abandoned the right to use 1077 Main Street for hospital purposes, including as a treatment facility, without securing a CUP; (3) that MCHA is exempt from the City's zoning laws and therefore can lease 1077 Main Street for any healthcare use, including a treatment facility; (4) that a purchaser of 1077 Main Street that utilizes the hospital property for any acute care behavioral health hospital would be authorized as a vested nonconforming use.

After an initial hearing, the trial court issued an order acknowledging that because MCHA is a governmental entity, it is immune from local zoning regulations.[7] The trial court also held that: (1) the former hospital was operating as a valid nonconforming use; and (2) any prospective purchaser would be entitled to the same

---

[7] See *Macon-Bibb County. Hosp. Auth. v. Madison*, 204 Ga. App. 741, 741-742 (420 SE2d 586) (1992) ("In Georgia, . . . property owned by the . . . county, and used for a governmental purpose, is exempt from municipal zoning regulation. . . . A county may use property it owns for a necessary governmental purpose, even though such use violates a zoning ordinance. . . . [And] a hospital authority . . . is a governmental entity and as such is entitled to those immunities traditionally enjoyed by . . . county governments and their agencies and instrumentalities.") (citations and punctuation omitted.).

nonconforming use as MCHA — to operate "a hospital," but not a treatment facility. The trial court then reserved for ruling after a bench trial the question of whether MCHA intentionally abandoned its nonconforming use, preventing transfer of the nonconforming use to any purchaser of 1077 Main Street.

After the bench trial, the trial court entered a final order, finding that

[b]ased on the evidence presented, . . . [MCHA] ha[d] abandoned its nonconforming use as a hospital for a period of more than [12] months. [MCHA] contend[ed] that it never has intended to abandon the use of the property as a hospital, but its actions and clear intention to sell the property indicate[d] otherwise. While [MCHA] previously ran the full-fledged Morgan Memorial Hospital on the property, the property ha[d] not been used as a hospital since the new Morgan Medical Center opened . . . in 2019. . . . Although the old hospital campus ha[d] not laid vacant, there ha[d] been no functional hospital at the property for more than [12] months. Instead, the site ha[d] been maintained and used for storage, x-ray facilities, rental by Athens Orthopedic Clinic, Covid vaccine administration, a potential Covid overflow location, and EMT and law enforcement training. These auxiliary services may benefit the new hospital, but they do not constitute a "hospital" in and of themselves. [Because MCHA] only uses the property for these supplemental services, a purchaser or lessor would only be entitled to use the property for similar purposes without having to obtain a conditional use permit.

7

This appeal followed.

1. As an initial matter, we must determine whether the trial court appropriately issued an order based on MCHA's petition.

> Under Georgia law, declaratory judgment actions are governed by the Declaratory Judgment Act, which provides: In cases of actual controversy, the respective superior courts of this state shall have power, upon petition or other appropriate pleading, to declare rights and other legal relations of any interested party petitioning for such declaration, whether or not further relief is or could be prayed; and the declaration shall have the force and effect of a final judgment or decree and be reviewable as such.

> To secure a declaratory judgment, the plaintiff must show facts or circumstances whereby it is in a position of uncertainty or insecurity because of a dispute and of having to take some future action which is properly incident to its alleged right, and which future action without direction from the court might reasonably jeopardize its interest. A declaratory judgment may not be granted in the absence of a justiciable controversy. The object of the declaratory judgment is to permit determination of a controversy before obligations are repudiated or rights are violated.[8]

---

[8] (Citations and punctuation omitted.) *Perdue v. Barron*, 367 Ga. App. 157, 163 (2) (885 SE2d 210) (2023), citing OCGA § 9-4-2.

"A declaratory judgment may not be granted in the absence of a justiciable controversy. . . . [B]ecause the issue is a jurisdictional one, we address the issue irrespective of whether it was raised by the parties."[9]

In this case, MCHA has marketed 1077 Main Street to prospective purchasers for a number of years, reaching at least two asking-price offers, and it has been prevented from closing by the City's insistence that the purchaser obtain a CUP. The City's ordinance change has created a sufficient controversy such that the trial court correctly ruled on MCHA's petition and has not issued an improper advisory opinion.[10] While we note that no potential lease appears in the record,[11] the City conceded at the abandonment hearing that MCHA could sell or lease without respect to zoning ordinances.

---

[9] (Citations and punctuation omitted.) *Effingham County Bd. of Commrs. v. Effingham County Indus. Dev. Auth.*, 286 Ga. App. 748, 749 (650 SE2d 274) (2007), quoting *Southern Gen. Ins. Co. v. Crews*, 253 Ga. App. 765, 767 (560 SE2d 331) (2002), citing *Lackey v. Lackey*, 216 Ga. 177, 178 (1) (115 SE2d 565) (1960).

[10] Compare *Effingham County Bd. of Commrs.*, 286 Ga. App. at 750 (vacating judgment because the court's order constituted an improper advisory opinion based on speculative future actions).

[11] But see *GeorgiaCarry.Org, Inc. v. Atlanta Botanical Garden, Inc.*, 306 Ga. 829, 837-840 (3) (834 SE2d 27) (2019) (determining the public/private nature of the property leased by a governmental entity to a private company based on the nature of the leasehold interest).

2. Next, the trial court correctly found that MCHA is immune from the City's zoning ordinances.[12] Thus, in the event that MCHA retained ownership of the property and operated a treatment facility at 1077 Main Street, it would be immune from any requirement to obtain a CUP under the City's 2019 zoning ordinances.[13] The City conceded this at the first hearing on the matter. To the extent that the trial court's orders hold this, we affirm those portions of the orders, but we reverse any portions that could be read to hold otherwise.

3. Finally, MCHA argues that the trial court erred by finding that a third party purchaser that intended to operate a treatment facility at 1077 Main Street could not

---

[12] See *Madison*, 204 Ga. App. at 742.

[13] See id. At the hearing, the City argued that MCHA would have to obtain a state license to operate a treatment facility pursuant to OCGA § 26-5-8; Ga. Comp. R & Regs. 111-8-19-.05 (a) ("A license will be issued, upon presentation of evidence satisfactory to the department, that the program is in compliance with these rules and all applicable federal and state laws for the handling and dispensing of drugs, and all state and local health, safety, (including fire, sanitation, building) and zoning requirements."). Nevertheless, these State license regulations do not differentiate between private or public providers, and in any event, they do not serve to allow the City to bar MCHA from operating a treatment facility at 1077 Main Street via its zoning ordinance. Compare *Goldrush II v. City of Marietta*, 267 Ga. 683, 698-699 (10) (482 SE2d 347) (1997) (explaining the difference between a vested property right to a nonconforming use versus the right (or lack thereof) to issuance of a yearly business license). Whether or not MCHA or any other provider meets any State requirement to run any facility at 1077 Main Street is outside the scope of this opinion.

do so without obtaining a CUP because (1) a treatment facility is not substantially similar to a hospital and would therefore constitute a new use, and (2) MCHA abandoned its hospital use at 1077 Main Street.

> We review the construction of a zoning ordinance under a de novo standard. The scope of review of the superior court is limited to all errors of law and determination as to whether the judgment or ruling below was sustained by substantial evidence. The substantial-evidence standard is effectively the same as the any-evidence standard.[14]

"In construing such an ordinance, we consider the general rule that the owner of land in fee has the right to use the property for any lawful purpose."[15] Moreover, "[n]onconforming uses run with the land and benefit a subsequent purchaser."[16] And

---

[14] (Citations and punctuation omitted.) *City of Dunwoody v. Discovery Practice Mgmt.*, 338 Ga. App. 135, 138 (2) (789 SE2d 386) (2016), quoting OCGA § 5-4-12 (b), *Burton v. Glynn County*, 297 Ga. 544, 546 (1) (776 SE2d 179) (2015); *City of Atlanta Government v. Smith*, 228 Ga. App. 864, 865 (1) (493 SE2d 51) (1997). See also *Haralson County v. Taylor Junkyard of Bremen*, 291 Ga. 321, 323-324 (2) (729 SE2d 357) (2012); *Northside Corp. v. City of Atlanta*, 275 Ga. App. 30, 31 (1) (619 SE2d 691) (2005); *Cherokee County v. Martin*, 253 Ga. App. 395, 396 (1) (559 SE2d 138) (2002).

[15] (Citation and punctuation omitted.) *Henry v. Cherokee County*, 290 Ga. App. 355, 356 (1) (659 SE2d 393) (2008), quoting *Martin*, 253 Ga. App. at 396 (1).

[16] *Henry*, 290 Ga. App. at 358 (3). See also *North Ga. Mountain Crisis Network v. City of Blue Ridge*, 248 Ga. App. 450, 452 (1) (546 SE2d 850) (2001); *Corey Outdoor Advertising v. Bd. of Zoning &c. of Atlanta*, 254 Ga. 221, 226 (4) (327 SE2d

11

"[i]n order to establish a grandfathered, nonconforming use, it is necessary to show that the land was used for the nonconforming purpose prior to the enactment of the zoning ordinance."[17]

(a) *Nature of the use*. It is undisputed that there were no zoning regulations applicable to the property when MCHA first established the hospital at 1077 Main Street. Eventually that changed. Prior to moving in December 2018, the City zoning ordinances applicable to 1077 Main Street included the P-1 zone in which healthcare services, including "dental, medical, optometry, psychiatric, [and] chiropractic," were permitted conforming uses.[18] Permitted conforming uses within healthcare services included "clinics (day services only), hospitals and laboratories, nursing homes/facility, [and] private offices." "Sanitariums and mental institutions," were

_____

178) (1985).

[17] *Henry*, 290 Ga. App. at 358 (3).

[18] "To provide areas for various types of professional, office, and institutional uses and businesses incidental thereto; to establish areas for institutional facilities, offices, and professional businesses to develop in proximity to each other without the threat of encroachment of more intense retail or general commercial uses; to encourage such uses to remain in proximity to developed residential areas and general commercial areas; to encourage non-linear development with shared parking, amenities, and access; and to establish a transitional area to buffer surrounding residential neighborhoods from general commercial and industrial uses."

12

prohibited in P-1. Although it is not clear when, at some point the City added "personal care homes" and "personal care establishments"[19] to healthcare services, with the former being conditional use and the latter being permitted uses; these classifications were also in the 2019 ordinances. All of the terms were undefined in the ordinances, except personal care establishment, and the code stated that dictionary definitions should apply for undefined terms.

MCHA presented the following definitions for hospital: "'[h]ospital' is customarily defined as 'an institution where the ill or injured may receive medical, surgical, or psychiatric treatment, nursing care, food and lodging, etc. 'Hospital' is a place to receive medical attention. 'Hospital' is a facility that provides emergency, inpatient and outpatient medical care for sick or injured people."[20] Alternatively, it provided that "[h]ospital' is 'an institution providing medical, surgical, or psychiatric testing and treatment for people who are ill, injured, pregnant, etc. on an inpatient,

---

[19] "A facility not occupied by the owner providing for the protective care, oversight, and personal service to two or more persons over eighteen (18) years of age for profit or not shall be broadly construed to include any form of group or congregate residency, including the terms Group Personal Care Home or Congregate Personal Care Home, with the exception of Nursing Homes, Emergency Shelters, and Personal Care Homes, unless otherwise herein noted."

[20] MCHA cited to Webster's New World Dictionary Second Edition for this definition.

13

outpatient, or emergency care basis: often involved with public health programs, research, medical education, etc.'"[21] Finally, MCHA provided a third definition: "'[h]ospital' is 'an institution for the medical, surgical, obstetric, or psychiatric care and treatment of patients.'"[22]

The trial court did not apply any dictionary definition of hospital to determine whether, based on the evidence presented by the parties about the nature of the services that would be provided at a treatment facility, those services constituted services like those that had been provided by MCHA and/or whether those services constituted services of a hospital. Instead, as we noted, the City and the trial court simply relied on state statutes, regulations, and license definitions to find that the treatment facility would not be a continuation of the use. This was erroneous based on the City's own rules for defining terms in its ordinance.[23] Moreover, the City has failed to present any evidence that the proposed treatment facility would provide

---

[21] MCHA again cited to Webster's New World Dictionary Third Edition for this definition.

[22] MCHA cited to Dictionary.com for this definition.

[23] See Official Zoning Ordinance of the City of Madison, Georgia § 200 (2019) ("Except as specifically provided herein, all words used in this Ordinance shall have their customary dictionary definitions."); Official Zoning Ordinance of the City of Madison, Georgia § 200 (2011) (same).

14

substantially different services than the historic uses at 1077 Main Street under

MCHA and instead continues to rely on state regulatory schemes for its arguments

before this court.[24]

The record established that MCHA conducted a wide array of services at 1077

Main Street, which included treatment of individuals with drug and alcohol addiction,

patients admitted for care for a vast number of conditions, clinics with physicians,

different tests and laboratories, and various administrative tasks. Based on the

definitions of hospital provided by MCHA, the treatment facility appears to constitute

a hospital in that it will provide medical and psychological care to patients. Zoning

ordinances "must be strictly construed in favor of the property owner and never

extended beyond their plain and explicit terms. Any restrictions must be clearly

established, and ambiguities in the language of zoning ordinances should be resolved

in favor of the free use of property."[25] The record before us establishes that a

---

[24] Compare *Henry*, 290 Ga. App. at 358 (3) (holding that a car shredder was not a continuation of the historic nonconforming use at a property, which was used as a car salvage yard, because the shredder would "create vibrations, dust[,] and smoke on the property").

[25] (Punctuation omitted.) Id. at 356 (1), quoting *Martin*, 253 Ga. App. at 396 (1).

treatment facility constitutes a hospital use for purposes of the City ordinances[26] and would be a continuation of the type of legal non-conforming use historically occurring at 1077 Main Street. To the extent that the trial court found otherwise, we reverse those rulings.

(b) *Abandonment*. Until December 2018, it is undisputed that MCHA operated a full acute care hospital at 1077 Main Street, and the City concedes that the use conformed with City ordinances for that district.[27] In presenting evidence of abandonment of the use by MCHA, the City improperly relied on its own zoning definition, noting that MCHA transferred its state CON and did not obtain a business license solely for 1077 Main Street. Of course, the City's definition of abandonment does not apply to MCHA, as the City has conceded. Therefore, if anything, the trial court should have applied the common law definition of abandonment, which historically "was construed to mean the intentional relinquishment of a known right

---

[26] The treatment facility may also constitute other uses, but based on the record evidence, it meets the definitions provided to the trial court.

[27] See Official Zoning Ordinance of the City of Madison, Georgia § 620.2 (2) (a) (2011) (defining "Professional/Office/Institutional District (P-1)" as "areas for various types of [such] uses and businesses incidental thereto . . ."), and § 620.3 Table 7 (2011) (permitting "hospitals and laboratories" in P-1 but prohibiting undefined "sanitariums and mental institutions" in P-1).

16

to devote the property to a permitted nonconforming use, evidenced by an overt act or failure to act, sufficient to support the implication of such an intent."[28]

MCHA established that it operated an acute care hospital at 1077 Main Street for almost 60 years, providing a range of healthcare services, both emergency and non-emergency, over that time period. Prior to moving, MCHA began marketing 1077 Main Street to other healthcare providers. Despite its move and inability to close on a sale, MCHA continues to house some of its hospital operations at 1077 Main Street, even though the full variety of hospital services do not currently occur at that location. Despite this, MCHA has spent over $100,000 a year maintaining the facilities and could restart full operations at the facility in a matter of days if necessary.[29] Pretermitting whether the common law notion of abandonment can even be applied to the vested right of a government actor like MCHA, in this case, the record before us does not establish any intent to abandon the use at 1077 Main Street

---

[28] (Punctuation omitted.) *Olympus Media, LLC v. City of Dunwoody*, 335 Ga. App. 62, 70 (3) (780 SE2d 108) (2015), quoting *Ansley House v. City of Atlanta*, 260 Ga. 540, 542 (397 SE2d 419) (1990).

[29] See *Beugnot v. Coweta County*, 231 Ga. App. 715, 718 (1) (a) (500 SE2d 28) (1998) ("A landowner will be held to have acquired a vested right to . . . initiate and continue a use [if] he has, in good faith, made a substantial change of position in relation to the land, made substantial expenditures, or has incurred substantial obligations.") (punctuation omitted), quoting *Goldrush II*, 267 Ga. at 698 (10).

by MCHA under the common law understanding of abandonment.[30] Therefore, to the

extent that the trial court found otherwise, we reverse those rulings.

*Judgment affirmed in part and reversed in part. Gobeil, J., and Senior Judge*

*C. Andrew Fuller concur.*

---

[30] See *Olympus Media, LLC*, 335 Ga. App. at 70 (3) (explaining that making changes to an existing property did not evince an intent to abandon); *Ansley House*, 260 Ga. at 543 (owner rebutted presumption of abandonment by overt acts to maintain and use the property, which acts tolled the time during which the abandonment period ran); *Beugnot*, 231 Ga. App. at 721-722 (1) (b) (explaining that landowner did not abandon the right to continue development of his mobile home park simply because the development occurred over many years while he obtained funding).